**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03691-RBJ-SKC

MANUEL ALEJANDRO CAMACHO,

    Plaintiff,

v.

CORDOVA, Deputy (in his individual capacity);
BUEN, Deputy (in his individual capacity);
DIBIASI, Deputy (in his individual capacity);
SMITH, Captain (in his individual capacity); and
CLEAR CREEK COUNTY SHERIFF'S OFFICE,

    Defendants.

---

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

    Defendants, **JACOB CORDOVA, ANDREW BUEN, NICK DIBIASE,** and **JEFF SMITH ("Defendants")**,[1] by and through their attorneys, **SGR, LLC**, hereby submit their Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56.[2]

    **AND IN SUPPORT THEREOF**, Defendants state as follows:

### CERTIFICATE OF CONFERRAL

---

[1] Defendants respectfully note that the Court previously dismissed Plaintiff's claim against the Clear Creek County Sheriff's Office, as well as Plaintiff's claims against the Defendant Deputies in their official capacities. [Dkt. 62].

[2] Defendants provided Notice of their Intent to File for Summary Judgment on June 17, 2022, [Dkt. 73], comporting with the requirement set forth in the Honorable R. Brooke Jackson's Judicial Practice Standards. RBJ Practice Standards, p. 2.

Plaintiff, *pro se*, is incarcerated in Cañon City, Colorado. Pursuant to D.C.COLO.LCivR 7.1(b)(1) and (3), Defendants were not required to confer with Plaintiff before filing this motion.

## I. INTRODUCTION

Plaintiff brings this action based on events that occurred in the Clear Creek County Detention Center. Plaintiff alleges Fourteenth Amendment violations based on: (1) Deputy Andrew Buen taking him to the ground; (2) Deputy Nick DiBiase allegedly tugging at his arms while he was on the ground; (3) Deputy DiBiase applying a leg strap; (4) DiBiase allegedly choking him with a helmet strap; and (5) general failure to intervene against all of the deputies.[3] [*See* Dkt. 8].

During litigation, Plaintiff made no initial disclosures and minimally engaged in discovery. He only recently provided late and unsworn responses to Defendants' First Set of Written Discovery, which contained no documents specifically responsive to Defendants' requests for production. Defendants now assert qualified immunity and move for summary judgment.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

1. On May 15, 2019, Deputies Andrew Buen ("Deputy Buen"), Jacob Cordova ("Deputy Cordova"), and Nick DiBiase ("Deputy DiBiase"), as well as Captain Jeff Smith ("Captain Smith") were working in the Clear Creek County Detention Facility.

2. At all relevant times, Deputies Buen, Cordova, and DiBiase, and Captain Smith, acted under color of law.

---

[3] The Court has construed Plaintiff's claims as being brought under the Fourteenth Amendment. [Dkt. 61, p. 8].

3. At approximately 9:54 AM, Plaintiff stepped out of Delta pod to head to County Court. Deputy Buen, Deputy Cordova, and Deputy DiBiase were in this general area. [**Exhibit A** (Declaration of Deputy Buen), at ¶ 3; **Exhibit B** (Declaration of Deputy Cordova), at ¶ 3; and **Exhibit C** (Declaration of Deputy DiBiase), at ¶ 3].

4. One other detainee was also present in this area, and he was unrestrained. [**Exhibit D** (Surveillance video 1), passim].

5. Deputy Cordova instructed Plaintiff to face the wall so he could perform a pat down search, and Plaintiff complied. [**Exhibit B**, at ¶¶ 4, 5; **Exhibit D**, at 0:27].

6. When detainees are transported for court appearances, it is the policy of the Clear Creek County Detention Center to perform a pat search and affix combination hand/leg restraints. The hand/leg restraints are connected by a length of chain. [**Exhibit B**, at ¶ 4; **Exhibit E** (Declaration of Captain Smith), at ¶ 2].

7. After the pat down search, Plaintiff turned around and Deputy Cordova placed handcuffs on his hands. [**Exhibit B**, at ¶ 6; **Exhibit D**, at 0:42-0:52].

8. After handcuffs were on Plaintiff, Deputy Cordova directed Plaintiff to turn around and face the wall so he could affix leg restraints. [**Exhibit B**, at ¶ 7; **Exhibit D**, at 1:00].

9. Around this time, Deputy DiBiase left the area. [**Exhibit D**, at 1:25-1:35].

10. Deputy Cordova bent over and affixed a leg restraint to Plaintiff's right leg. [**Exhibit B**, at ¶ 8; **Exhibit C**, at ¶ 5; **Exhibit D**, at 1:05]. Deputy Cordova, while still bent over, attempted to affix a leg restraint to Plaintiff's left leg, and Plaintiff commented that, "It won't fit." [**Exhibit B**, at ¶ 9; **Exhibit C**, at ¶ 5].

3

11. Plaintiff had previously been involved in a motorcycle accident that resulted in his left ankle being permanently swollen and disfigured. [Dkt. 8, p. 6].

12. Deputy Cordova, still bent over, felt Plaintiff's left ankle and noted that it felt enlarged. Plaintiff stated it was this way because of a broken ankle. [**Exhibit B**, at ¶ 9; **Exhibit D**, at 1:25-1:35].

13. Deputy Cordova told Plaintiff that he would only try to get one "click" on the left leg restraint. [**Exhibit B**, at ¶ 10].

14. Plaintiff responded with a loud, aggravated tone, expressing that "It's not going to fucking work!" [**Exhibit A**, at ¶ 7; **Exhibit B**, at ¶ 11; **Exhibit C**, at ¶ 6].

15. Deputy Cordova was visibly taken aback by Plaintiff's reaction, and Deputy Buen's attention immediately went toward the interaction. [**Exhibit D**, at 1:35-1:40].

16. Deputy Buen had been standing nearby and started walking toward Plaintiff and Deputy Cordova, asking Plaintiff if there was going to be a problem. [**Exhibit A**, at ¶ 8; **Exhibit B**, at ¶ 12; **Exhibit C**, at ¶ 7; **Exhibit D**, at 1:35-1:39].

17. Deputy Cordova was still bent over as Deputy Buen approached. [**Exhibit D**, at 1:37-1:39].

18. Plaintiff responded by saying, "Fuck yeah there is," "Yeah, we're gonna have a fucking problem," or something similar. [**Exhibit A**, at ¶ 8; **Exhibit B**, at ¶ 13; **Exhibit C**, at ¶ 7].

19. Plaintiff then turned and stepped away from the leg restraint, making a motion with his upper left shoulder toward Deputy Buen that all Deputies noted and that the two in the room thought may be in preparation for an assault against them. [**Exhibit A**, at ¶¶ 9-10; **Exhibit B**, at ¶ 14; **Exhibit C**, at ¶ 7; **Exhibit D**, at 1:38-1:41].

20. Deputy Cordova was only now beginning to stand upright after having been bent over near Plaintiff. [**Exhibit D**, at 1:40-1:41].

21. Deputy Buen took Plaintiff to the ground in an attempt to end the threat of potential assault and to control Plaintiff, which his training taught him was easier to do when an individual is on the ground. [**Exhibit A**, at ¶ 11; **Exhibit B**, at ¶ 15; **Exhibit C**, at ¶ 8; **Exhibit D**, at 1:41-1:43].

22. Plaintiff landed on his right shoulder. [**Exhibit D**, at 1:41-1:43].

23. After Deputy Buen took Plaintiff to the ground, Deputy DiBiase re-entered the area and kneeled by Plaintiff. [**Exhibit D**, at 1:47].

24. Plaintiff intentionally struck his head to the ground twice while deputies first tried to control him. Deputy Cordova placed his hands under Plaintiff's head, preventing him from hitting his head again. [**Exhibit A**, at ¶ 12; **Exhibit B**, at ¶ 18; **Exhibit C**, at ¶ 10].

25. Deputy Buen rested his weight on Plaintiff's legs, while Deputy Cordova held down Plaintiff's torso and head. [**Exhibit A**, at ¶¶ 12-13; **Exhibit** C, at ¶ 9; **Exhibit D**, at 1:52-3:03].

26. Deputy Buen put his hand on Plaintiff's back in a nonaggressive manner to speak with him, to try and de-escalate the situation, and to explain to him that the deputies needed him to stop resisting so they could remove the restraints and place his hands behind his back. [**Exhibit A**, at ¶ 13; **Exhibit D**, at 2:12]

27. Deputy DiBiase gained control of Plaintiff's ankles. And when he did so, Plaintiff immediately complained of pain. [**Exhibit C**, at ¶ 11; *see* **Exhibit D**, at 2:00-2:26].

28. Deputy DiBiase then released Plaintiff's ankles and left to obtain the WRAP restraint system, to ensure that Plaintiff would not harm himself or deputies. The WRAP restraint

5

system is typically used after a detainee or inmate fights with deputies. [**Exhibit B**, at ¶ 20; **Exhibit C**, at ¶¶ 13, 14; *see* **Exhibit D**, at 2:28-3:04].

29. Deputies rolled Plaintiff over so they could utilize the WRAP system. [**Exhibit A**, at ¶ 14, 15; **Exhibit D**, at 3:03-3:10].

30. Captain Smith arrived as the leg strap was applied. [**Exhibit A**, at ¶ 16; **Exhibit C**, at ¶ 15; **Exhibit D**, at 3:34].

31. After Plaintiff agreed to comply and deputies rolled him to his side, into a safety position, Plaintiff became resistive without any instigation. He resisted deputies' attempts to get his hands under control, and he attempted to pull, roll away, and pin his arms underneath him. Plaintiff would not comply with orders to stop resisting and would not calm down, becoming extremely combative. [**Exhibit A**, at ¶ 14; **Exhibit B**, at ¶¶ 16, 17; **Exhibit C**, at ¶ 12; **Exhibit E**, at ¶ 4; *see* **Exhibit D**, at 3:45-4:00].

32. Deputy DiBiase used the WRAP system's soft nylon and Velcro strap to hold Plaintiff's ankles in place while other deputies were deploying the WRAP restraint system. [**Exhibit C**, at ¶ 14; **Exhibit D**, at 4:06-4:28].

33. Deputy DiBiase used only the force necessary with the soft nylon and Velcro strap as to prevent Plaintiff from striking anything with his legs. [**Exhibit C**, at ¶ 14].

34. A helmet was placed on Plaintiff's head to prevent him from further striking his head on the ground. Deputy DiBiase was not in the room when this occurred, as he had already left to get the WRAP restraint chair. [**Exhibit C**, at ¶ 16; *see* **Exhibit F** (Surveillance video 2), at 0:43-1:30].

35. After the helmet was attached, Plaintiff visibly pulled the chin strap all the way to the front of his chin, loosening it and stretching it out. [**Exhibit F**, at 1:50-1:55].

36. After the helmet was placed on Plaintiff, wrist restraints were switched from being in the front of Plaintiff to behind him, and he was cuffed with two sets of handcuffs attached to each other, to make it more comfortable. [**Exhibit A**, at ¶ 18; **Exhibit F**, at 2:10-3:05; **Exhibit E**, at ¶ 5]. Deputies checked the cuffs for circulation. [**Exhibit A**, at ¶18; **Exhibit C**, at ¶16].

37. Both before and after Plaintiff was placed in the WRAP restraint chair, the helmet strap can be seen hanging loosely. [**Exhibit F**, at 3:16-3:40].

38. Once Plaintiff was restrained in the WRAP system, Deputies transferred him to the WRAP restraint chair, where his arms were then secured. [**Exhibit F**, at 3:35-4:42].

39. After he was placed into the WRAP restraint chair, Plaintiff threatened to spit on deputies. Deputy DiBiase held Plaintiff's head still, so he could not spit at the deputies, while they obtained a spit hood which Deputy DiBiase then placed on Plaintiff's head. [**Exhibit A**, at ¶ 20; **Exhibit C**, at ¶ 19; *see* **Exhibit F**, at 5:06-5:51]

40. Deputies attempted to remove Plaintiff from the WRAP restraint chair at 10:33 AM. [**Exhibit G** (Surveillance video 3), at 0:45]

41. Deputy DiBiase walked away, after being a part of a group of deputies trying to remove Plaintiff from restraint chair, because Plaintiff had threatened to slit his throat and kill his kids. [**Exhibit C**, at ¶ 19; *see* **Exhibit G**, at 2:50].

42. Deputies removed Plaintiff from the WRAP restraint chair at 10:37 AM, so he could be medically checked and escorted to a cell for a five (5) day lockdown. [**Exhibit A**, at ¶ 22-23; **Exhibit C**, at ¶ 20; **Exhibit G**, at 4:45].

43. The Clear Creek County Detention Center is a small facility, and altercations with inmates or detainees present substantial threats. Captain Smith believes this incident could have been much worse, given the presence of another detainee. [**Exhibit E**, at ¶ 6].

44. At no time did Captain Smith observe anything that he viewed as excessive, particularly given Plaintiff's combativeness, non-compliance, and resistance. [**Exhibit E**, at ¶ 8].

45. Plaintiff has produced no documents to substantiate that he suffered a physical injury *due to* this incident.[4]

46. Plaintiff has produced no documents to substantiate that he suffered a mental injury *due to* this incident.

### III.   STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Declarations, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). And an issue of fact is only "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 242.

---

[4] Defendants note that the discovery deadline passed, with multiple extensions, on September 16, 2022. [*See* Dkt. 112, p. 3].

8

The burden then shifts to the non-moving party to produce evidence creating a genuine issue of material fact to be resolved at trial. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). "The Plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Liberty Lobby*, 477 U.S. at 257. The nonmoving party's evidence must be more than mere reargument of his case or a denial of an opponent's allegation. *Mascarenas v. American Family Mut. Ins. Co.*, Civil Action No. 14-cv-02799-KLM, 2015 WL 8303604 (D.Colo. Dec. 8, 2015). The nonmoving party cannot rely entirely on pleadings but must present significant probative evidence to support its position. *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1247 (10th Cir. 2013). And an alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247.

In considering evidence within the record, the Court need not adopt a "blatantly contradicted" version of the facts, especially where audio or video quite clearly contradict the allegations. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008).

## IV.   ARGUMENT

### A. Defendants are Entitled to Qualified Immunity.

Given the underlying purposes of the qualified immunity defense, courts review motions for summary judgment asserting qualified immunity differently than other summary judgment motions. *See Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010). After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a heavy two-part burden.

9

*Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "The plaintiff must first establish 'that the defendant's actions violated a constitutional or statutory right.'" *Id*. "If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." *Id*. The clearly established inquiry is "a demanding standard that the Supreme Court says requires a high degree of specificity." *Estate of Lewis v. City of Edmond*, No. 21-6081, 2022 WL 4282659 (10th Cir. Sept. 16, 2022) (citing *Dist. Of Columbia v. Wesby*, 138 S.Ct. 577, 589-90) (internal citation and quotations omitted).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). To demonstrate that the law is clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *See Schwartz v. Booker*, 702 F.3d 573, 587–88 (10th Cir. 2012). Courts must not define clearly established law at a high level of generality. *See Mullenix*, 577 U.S. at 12. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id*. (internal citations omitted) (emphasis in original).

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, "[i]f the

10

[P]laintiff fails to satisfy either part of the two-part inquiry, the court must grant the [D]efendant qualified immunity." *Medina*, 252 F.3d at 1128.

   1. **Defendants Did Not Violate Plaintiff's Rights under The Fourteenth Amendment.**

To prevail on a § 1983 claim founded on excessive force and citing the Fourteenth Amendment, a pretrial detainee must show that the force used against him was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Courts "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Id.* at 399. In evaluating whether a use of force is reasonable or unreasonable, courts can consider: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id.* at 397. Under the Due Process clause, a pretrial detainee is protected from the use of excessive force that amounts to punishment. *Id.* at 397 (citing *Graham v. Connor*, 490 U.S. 386, 395, n. 10 (1989).

The Supreme Court has recognized that "running a prison is an inordinately difficult undertaking, and that safety and order at these institutions requires the expertise of correctional officers, who must have substantial discretion to devise reasonable solutions to the problems they face." *Kingsley*, 576 U.S. at 398. Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Kingsley*, 576 U.S. at 399 (quoting *Graham*, 490 U.S. at 397). Therefore, a court's determination regarding use of force must account for the legitimate interests stemming from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and

practices that in the judgment of the jail officials are needed to preserve internal order and discipline and to maintain institutional security. *Kingsley*, 576 U.S. at 397.

### a. Deputy Buen Taking Plaintiff to The Ground Did Not Violate Plaintiff's Rights.

Evaluating Deputy Buen's use of force requires viewing the incident through Deputy Buen's eyes, considering what he knew at the time. Here, Deputy Buen knew that Deputy DiBiase had left the area. **SUMF**, at 8. He knew that Deputy Cordova was preoccupied with trying to affix the leg restraint to Plaintiff's left leg, leaving him in a vulnerable position. **SUMF**, at 9, 11-12. And he knew one other detainee was unrestrained in the area. **SUMF**, at 4. Therefore, a reasonable deputy in Deputy Buen's situation would recognize that he was keeping watch, especially for the sake of his preoccupied and vulnerable colleague.

Mindful of what Deputy Buen knew, the Court should then consider how a reasonable deputy on the scene would react to Plaintiff's acts. A reasonable deputy would have directed extra attention toward Plaintiff, as Plaintiff was becoming aggravated, raising his voice, and swearing at Deputy Cordova, who was himself in a preoccupied state and vulnerable position. **SUMF**, at 9, 11-14. A reasonable deputy would have seen Deputy Cordova be taken aback by Plaintiff's aggravated words and tone, and a reasonable deputy's head would have snapped to that situation— which is exactly what Deputy Buen did. **SUMF**, at 13-14. A reasonable deputy would also recognize that Plaintiff was agitated and may pose a security threat. Therefore, a reasonable deputy would try to establish verbal communication to verify whether there is a problem and close the gap, in case there was one, to protect Deputy Cordova – all things done by Deputy Buen before any force was used. **SUMF**, at 15, 16.

In response to Deputy Buen's reasonable inquiry about whether there was going to be a problem, Plaintiff did not choose to de-escalate or explain the situation; instead, he chose to say, "Fuck yeah there is," "Yeah we're gonna have a fucking problem," or something expressing a similar sentiment. **SUMF**, at 17. Deputy Cordova was still bent over by Plaintiff. **SUMF**, at 16. As Plaintiff made this statement, he was turning toward Deputy Buen, pulling his leg away from the restraints, and he lunged his upper right shoulder forward, in what a reasonable deputy could construe as an assertive motion and the beginning of an assault. **SUMF**, at 18. A reasonable deputy would have noted that Plaintiff had one leg free and that the cuffs would not prevent him from delivering a blow to Deputy Cordova. Deputy Buen took Plaintiff to the ground only to control the perceived threat of assault. **SUMF**, at 20. This was consistent with his training, which a reasonable deputy would rely upon, and which taught him that it is easier to control an individual who is on the ground. **SUMF**, at 20. Additionally, this act would permit Deputy Cordova to assess the best means of assistance, before other deputies arrived for support. Deputy Buen's acts were consistent with those of a reasonable deputy who knew what Deputy Buen knew at the time.

Considering other factors relevant to a Fourteenth Amendment analysis, the security threat was significant given that Deputy Cordova was in a vulnerable position and only Deputy Buen was in a position to respond to Plaintiff's escalation. **SUMF**, at 13, 15, 16-19. Had Plaintiff chosen to strike Deputy Cordova, Plaintiff could have caused significant injury. [*See* **Exhibit D**, at 1:36]. And had the other detainee participated, both Deputies Cordova and Buen could have been injured. [*See generally* **Exhibit D**]. Captain Smith has noted that the Clear Creek County Detention Center is a small facility, where altercations between deputies and inmates can present substantial threats.

**SUMF**, at 43. According to Captain Smith, this incident could have been much worse, especially if the second detainee had participated. **SUMF**, at 43.

A reasonable deputy would have perceived a threat from Plaintiff's escalating tone and loudness, as well as his shoulder lunge. **SUMF**, at 13, 15-18. In approaching the situation, Deputy Buen first tried using words to evaluate and potentially defuse the situation. **SUMF**, at 15. Instead of indicating that there was no issue, however, Plaintiff chose to exclaim "Fuck yeah there is [a problem]," "Yeah we're gonna have a fucking problem," or something expressing a similar sentiment, and he turned toward Deputy Buen, lunging his left shoulder at him as if about to fight. **SUMF**, at 17-18. With regard to the force used, Plaintiff's arms were restrained, and Plaintiff would not have been able to break his fall to the ground without posing some risk of injury to his wrist. [*See* **Exhibit D**, at 1:40]. However, Deputy Buen placed his arm in such a position that it was between the ground and Plaintiff's head as the two went to the ground, ensuring Plaintiff would not sustain any trauma. [*See* **Exhibit D**, at 1:40]. Such use of force was justified given the potential threat from Plaintiff. Finally, Defendants note that Plaintiff has produced no documents to substantiate that he suffered any neck injury from this incident. [Dkt. 8, p. 8 (Plaintiff claiming his neck cracked and he could not breathe)]. The period for discovery has concluded, [Dkt. Nos. 106 and 107], and Plaintiff will not be able to carry his burden.

   b. **The Record Blatantly Contradicts Plaintiff's Allegation That Deputy DiBiase Tugged on His Arms.**

**Exhibit D** shows the relevant period for Plaintiff's allegations that Deputy DiBiase tugged on his arms, and it blatantly contradicts the allegations. [*Compare* **Exhibit D**, at 1:43-3:06 *with* Dkt. 8, pp. 9-10]. Plaintiff alleges that "[D]eputy Di[B]ias[e] began his assault when [D]eputies Cordova and Buen were kneeling on my back while I was already restrained in handcuffs and one

14

leg iron on my right ankle. Deputy Di[B]ias[e] tugged at my arms repeatedly causing pain in my shoulder (left) and my wrists." [Dkt. 8, p. 9]. Plaintiff describes this as occurring after he was taken to the ground and before he was shifted to his side. [Dkt. 8, pp. 9-10].

First, running counter to Plaintiff's Complaint, [5] two deputies did not kneel on Plaintiff's back. Deputy Buen rested one knee on Plaintiff's thighs, and he later put one hand on Plaintiff's back while trying to de-escalate the situation and speak with Plaintiff. **SUMF**, at 24-25. Deputy Cordova held Plaintiff's torso and head, but he did not kneel on Plaintiff. **SUMF**, at 24.

Second, the video evidence is inconsistent with Plaintiff's allegation. **Exhibit D** shows that Deputy DiBiase entered the area where Plaintiff was on the ground and kneeled by Plaintiff. **SUMF**, at 22. After he entered the room, Deputy DiBiase's left arm is clearly visible and is not tugging on Plaintiff's handcuffs. [*See* **Exhibit D**, at 1:49-1:57]. Deputy DiBiase's right arm is obstructed; however, his shoulder and body show no movement that would be indicative of him performing any jerk or tug. [*See* **Exhibit D**, at 1:49-1:57]. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, such that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 379 (2007).

To the extent the Court is reluctant to find a blatant contradiction, Defendants note that Plaintiff has produced no documents to substantiate an injury to his left shoulder and wrists from this incident. [Dkt. 8, p. 9 (Plaintiff claiming pain in his left shoulder and wrists)]. The period for discovery has concluded, [Dkt. Nos. 106 and 107], and Plaintiff will not be able to carry his burden.

---

[5] Plaintiff alleged that Deputies "Cordova and Buen were kneeling on my back," during this period. [Dkt. 8, p. 9].

15

### c. Deputy DiBiase's Use of The Leg Strap Did Not Violate Plaintiff's Rights.

Defendants do not contest that Deputy DiBiase put the nylon and Velcro ankle restraint on Plaintiff but maintain that it does not rise to a constitutional violation. **SUMF**, at 31-32. Drawing an analog to handcuffs, it is "a fact that [restraints] are not comfortable and [detainees] frequently complain about pain caused by their use." *Mglej v. Gardner*, 974 F.3d 1151, 1169 (10th Cir. 2020). For this reason, in the Fourth Amendment context, "conclusory complaints of pain alone are insufficient to support" an excessive force claim involving handcuffs. *Koch v. City of Del City*, 660 F.3d 1228, 1247-48 (10th Cir. 2011). Again, following the analog of handcuffs, a claim of excessive force "requires some injury that is not *de minimis*, be it physical or emotional." *Cortez v. McCauley*, 478 F.3d 1108, 1129 (D.Colo. 2007) (citing *Tarver v. City of Edna*, 410 F.3d 745, 752) (5th Cir. 2005). Courts have held that nerve damage and lacerations are the kinds of injuries that can meet this standard. *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (Plaintiff complaining to officer that cuffs were too tight presents too little evidence of any actual injury on summary judgment); *Mglej*, 974 F.3d at 1169 (documentation of nerve damage is sufficient to establish actual, non-*de minimis* injury from handcuffs). Scrapes are not sufficient. *Koch*, 660 F.3d at 1247-48 (photographs merely showing superficial abrasions is not sufficient to establish non-*de minimis* injury in the absence of any evidenced emotional harm).

Here, Plaintiff alleges that "Deputy Di[B]ias[e] attached a nylon strip around both of my ankles," and "[h]e pulled it so tight that it cut off the circulation around both of my feet, eventually causing them to go numb and causing pain in my ankles initially." [Dkt. 8, p. 10]. He further alleges that he "complained to the deputies that it was too tight." [Dkt. 8, p. 10].

Plaintiff's allegations do not rise above a *de minimis* injury. Plaintiff does not allege nerve damage or lacerations from the use of the leg strap—he alleges temporary numbness and some ankle pain. [*See* Dkt. 8, p. 10]. Notably, Plaintiff admits that Deputy DiBiase loosened the strap after he complained that his feet were numb. [Dkt. 8, p. 11]. Further, Defendants note that Plaintiff has again produced no documents to substantiate that he suffered a leg injury from this incident. [Dkt. 8, p. 10]. The period for discovery has concluded, [Dkt. Nos. 106 and 107], and Plaintiff will not be able to carry his burden.

### d. The Record Blatantly Contradicts Plaintiff's Allegation That Deputy DiBiase Choked Him with A Helmet Strap.

**Exhibit F** shows the relevant period for Plaintiff's allegation that Deputy DiBiase choked him with a helmet strap, and it blatantly contradicts Plaintiff's allegations. [*Compare* **Exhibit F**, at 0:20-5:52 *with* Dkt. 8, p. 10-11]. Plaintiff alleges in his Complaint that Deputy DiBiase "placed a helm[e]t over [his] head that had a chin strap attached to it," and "[f]rom behind me, [D]eputy Di[B]ias[e] pulled the helm[e]t to choke me for about 5-10 seconds." [Dkt. 8, p. 10]. He further alleges that, after the deputies had placed him in a security chair and locked the handcuffs to the chair, that "Di[B]ias[e] again pulled on the helm[e]t from behind me to choke me with the strap of the helm[e]t." [Dkt. 8, p. 10].

As an initial matter, Deputy DiBiase was not present when the helmet was placed on Plaintiff. **SUMF**, at 33.[6] At that time, Deputy DiBiase had gone to obtain the restraint chair. **SUMF**, at 33. Further, **Exhibit F** does not show any choking, let alone a 5-10 second period of it. [*See* **Exhibit F**, at 0:20-5:52]. Plaintiff was placed in the chair, and his arms were secured. **SUMF**,

---

[6] Deputy DiBiase can be seen leaving the area around the 0:20 mark of **Exhibit F.**

17

at 37. After Plaintiff was placed in the chair and restrained, he threatened to spit on the deputies and a spit hood was placed over his head. **SUMF**, at 41. Deputy DiBiase held Plaintiff's head still in the period between Plaintiff's threat and the deputies obtaining the spit hood. **SUMF**, at 38. At no point in the video is Deputy DiBiase seen choking Plaintiff with the helmet strap, much less for a 5-10 second period, as alleged. To the contrary, before Plaintiff was placed in the WRAP restraint chair, he can be seen pulling the chin strap all the way in front of his chin, to stretch it out and loosen it. **SUMF**, at 34. And the strap can be seen loosely hanging, both before and after he was placed in the WRAP restraint chair. **SUMF**, at 36.

To the extent the Court is reluctant to find blatant contradiction, Defendants note that Plaintiff has produced no documents to substantiate an injury to his left shoulder or neck from this incident. [Dkt. 8, p. 10 (Plaintiff claiming pain in his left shoulder and being unable to breathe)]. The period for discovery has concluded, [Dkt. Nos. 106 and 107], and Plaintiff will not be able to carry his burden.

   e. **Defendants Did not Fail to Intervene.**

A law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983. *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996). For there to be a failure to intervene, there must be an underlying constitutional violation. *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015). A plaintiff must show that the defendant "observed and had reason to know" of a constitutional violation and had a "realistic opportunity to intervene." *Jones*, 809 F.3d at 576 (citing *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1201 (10th Cir. 2008)).

Here, none of the Deputies observed or had reason to know of a constitutional violation, and none of the Deputies had a realistic opportunity to intervene given the descriptions of events provided in Plaintiff's allegations. **SUMF**, at 44. [*See generally* Dkt. 8, **Exhibit D**, and **Exhibit F**]. Therefore, Plaintiff's failure to intervene claims must fail.

### 2. Plaintiff Cannot Point to Clearly Established Law.

Plaintiff will not be able to identify clearly established law at the time of Defendants' alleged wrongdoing demonstrating that their conduct would violate the Fourteenth Amendment. The burden clearly rests on Plaintiff to identify a case or cases where deputies acting under similar circumstances were held to have violated the constitution. *White v. Pauly,* 137 S.Ct. 548 (2017).

### V. CONCLUSION

For the reasons stated herein, Plaintiff's remaining claims for relief should be dismissed pursuant to Fed.R.Civ.P. 56.

Respectfully submitted,

/s/ Eric M. Ziporin
***Eric M. Ziporin***

/s/ Justin A. Twardowski
***Justin A. Twardowski***
SGR, LLC
3900 East Mexico Avenue, Suite 700
Denver, CO 80210
Telephone: (303) 320-0509
Facsimile: (303) 320-0210
*Attorneys for Defendants Cordova, Buen, Dibiase, and Smith*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 7th day of November, 2022, I electronically filed a true and correct copy of the above and foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system. I further certify that I mailed a copy of said document to the following non-CM/ECF participant by U.S. Mail, first class postage prepaid and via email:

Manuel A. Camacho *via U.S. Mail*
5904 Oneida Street
Commerce City, CO 80022

Manuel A. Camacho *via U.S. Mail*
Register No. 69393
Unit: C-2L-2
Box No. 300
Canon City, CO 81215

Manuel E. Camacho
Mannylove303@gmail.com *via email*

s/ Barbara A. Ortell
Barbara A. Ortell
Legal Secretary