IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03691-RBJ-SKC

MANUEL ALEJANDRO CAMACHO,

    Plaintiff,

v.

CORDOVA, Deputy;
BUEN, Deputy;
DIBIASI, Deputy;
SMITH, Captain; and
CLEAR CREEK COUNTY SHERIFF'S OFFICE,

    Defendants.

## DECLARATION OF DEPUTY ANDREW BUEN

Declarant, **DEPUTY ANDREW BUEN**, states as follows:

1. In May 2019, I was employed at the Clear Creek County Detention Center. I have personal knowledge of the matters set forth below.

2. On May 15, 2019, I was working my assigned shift, supervising inmates, at the Clear Creek County Detention Center.

3. At approximately 9:54 AM, Manuel Camacho stepped out of Delta Pod to be escorted to County Court by Deputy Jacob Cordova. Another inmate was seated next to where Mr. Camacho was standing.

**Exhibit A**

4. Deputy Jacob Cordova performed a pat down search and began placing the court restraint setup on Mr. Camacho. The court restraint setup consists of wrist and ankle restraints, which are joined by a chain.

5. Deputy Cordova placed the wrist restraints on Mr. Camacho, and he attached the leg restraint to Mr. Camacho's right ankle.

6. While Deputy Cordova was attempting to place the leg restraint on Mr. Camacho's left ankle, Mr. Camacho stated that he had a leg injury and could not be restrained.

7. Mr. Camacho moved his leg from its position in the air and said, "It's not going to fucking work!" This aggressive and loud tone raised a safety concern for me.

8. I then asked Mr. Camacho as I approached if there was going to be a problem, and he said, "Fuck, yeah, there is!" This additional aggressive comment further raised a safety concern for me.

9. As Mr. Camacho said this, he turned toward me in a manner that I perceived to be threatening and in preparation of a potential assault against me and the other deputies. My concern was heightened given the earlier aggressive statements from Mr. Camacho.

10. I was also concerned because this was happening in the presence of another inmate who could potentially join in any attempted assault against me and the other deputies.

11. Pursuant to my training, I brought Mr. Camacho to the ground in an attempt to end the threat of a potential assault. The training that I received taught me that it is easier to control an inmate on the ground as opposed to when they are upright.

12. While on the ground, Mr. Camacho intentionally hit his head on the ground multiple times. To control Mr. Camacho and prevent him from injuring himself, I rested my weight on Mr. Camacho's legs while Deputy Cordova held down his torso and head.

13. Sometime shortly after Deputy Cordova and I reached this position, I put my hand on Mr. Camacho's back in a nonaggressive manner to speak with him, to try and de-escalate the situation, and to explain that we needed him to stop resisting so we could remove the restraints that were already on him and place his hands behind his back.

14. Mr. Camacho agreed to comply, and we rolled him onto his side, into a safety position so we could remove the restraints. However, Mr. Camacho then became resistive without any instigation. He resisted our attempts to get his hands under control, trying to roll over and pin his arms underneath him. Mr. Camacho did not comply with commands to stop resisting.

15. Deputy Nick DiBiase arrived with the WRAP restraint system. The WRAP system is a means of ensuring that a detainee will not harm himself or others and is typically used after an inmate fights with deputies. Deputy DiBiase assisted Deputy Cordova and me in restraining Mr. Camacho so that we could be sure he posed no risk of injury to himself or deputies.

16. Captain Jeff Smith arrived on scene while we were restraining Mr. Camacho in the restraint system.

17. On a couple of occasions, Mr. Camacho attempted to pull away from us as we were applying the WRAP system. We held Mr. Camacho down while Deputy DiBiase was able to apply the restraints.

18. Mr. Camacho was placed in the WRAP ankle restraint. Two sets of wrist restraints were locked together to make it more comfortable for Mr. Camacho, and we checked the cuff

tightness for circulation. Mr. Camacho was also placed in a helmet because he had intentionally hit his head on the floor multiple times.

19. At 10:02 A.M., Mr. Camacho was transferred to the WRAP restraint chair.

20. A spit hood was placed over Mr. Camacho's head after he had threatened to spit on deputies. A spit hood is a breathable fabric that can be placed over a person's head to prevent them from spitting or biting.

21. At no time did I see Deputy DiBiase choke Mr. Camacho with the strap from the helmet.

22. Mr. Camacho was removed from the WRAP restraint chair at 10:37 A.M. so he could be escorted to a cell for a five (5) day lockdown given that he had fought with deputies.

23. After Mr. Camacho was released from the WRAP restraint chair, me and other deputies ensured that Mr. Camacho received a medical follow-up.

## VERIFICATION

I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.

Executed on the __5__ day of __NOVEMBER__, 20 __22__.

At __0222 GEORGETOWN__ (city), Colorado.

SIGNED:

_____
Name: ANDREW BUEN

4