**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03691-RBJ-SKC

MANUEL ALEJANDRO CAMACHO,

    Plaintiff,

v.

CORDOVA, Deputy;
BUEN, Deputy;
DIBIASI, Deputy;
SMITH, Captain; and
CLEAR CREEK COUNTY SHERIFF'S OFFICE,

    Defendants.

**DELCARATION OF DEPUTY NICK DIBIASE**

Declarant, **DEPUTY NICK DIBIASE**, states as follows:

1. In May 2019, I was employed at the Clear Creek County Detention Center. I have personal knowledge of the matters set forth below.

2. On May 15, 2019, I was working my assigned shift, supervising inmates, at the Clear Creek County Detention Center.

3. At approximately 9:54 AM, Manuel Camacho stepped out of Delta Pod to be escorted to county court by Deputy Jacob Cordova.

4. Deputy Jacob Cordova pat down searched Mr. Camacho, per policy, and placed him in wrist restraints.

**Exhibit C**

5. Deputy Cordova then began to place Mr. Camacho in leg restraints. As Deputy Cordova tried to attach the final leg restraint to Mr. Camacho's left ankle, Mr. Camacho stated that he had a leg injury and could not be restrained.

6. Mr. Camacho moved his left leg away from Deputy Cordova, saying, "It's not going to fucking work!"

7. Deputy Andrew Buen was nearby and asked Mr. Camacho if there was going to be a problem. Mr. Camacho said, "Fuck, yeah, there is!" and made a motion toward Deputy Buen.

8. Deputy Buen attempted to gain control of Mr. Camacho, and both went to the floor.

9. While on the floor, I held Mr. Camacho's legs as Deputies Cordova and Buen held down his upper body.

10. While on the ground, Mr. Camacho intentionally struck his head to the ground several times. Mr. Camacho also became extremely combative and refused to comply with deputies' commands to stop fighting and resisting.

11. After I gained control of Mr. Camacho's ankles, he complained of leg pain.

12. A couple of times on the ground, Mr. Camacho attempted to pull away from the deputies that were trying to control him and hold him down.

13. To prevent Mr. Camacho from harming himself or deputies, we released Mr. Camacho's ankles and got the WRAP restraint system.

14. I used the WRAP restraint system's soft nylon and Velcro strap to hold Mr. Camacho's legs in place. I tightened it enough that Mr. Camacho could not strike anything with his legs, but no more than was necessary to serve that purpose.

15. After I fastened the soft nylon and Velcro strap, I noticed that Captain Smith had arrived on scene.

16. Mr. Camacho was placed in wrist restraints, which were double locked and checked for circulation, and a helmet was placed on him, due to his previous attempts to hit his head on the ground.

17. Mr. Camacho was moved into a WRAP restraint chair at 10:02 AM.

18. At no time in my interactions with Mr. Camacho did I choke Mr. Camacho with the strap of the helmet.

19. After he threatened to spit on deputies, I grabbed onto Mr. Camacho's head and held it still, so that he could not spit on any deputies. I did this until deputies were able to obtain a spit hood, which I then placed over Mr. Camacho's head. A spit hood is a breathable fabric that can be placed over a person's head to prevent them from spitting or biting. I attempted to remove Mr. Camacho from the restraint chair at 10:34 AM. However, Mr. Camacho threatened to slit my throat and kill my kids. I walked away, as my presence seemed to make Mr. Camacho angrier. Other deputies removed him from the chair at 10:37 AM.

20. Mr. Camacho was then escorted to a cell for a five (5) day lockdown given that he had fought with deputies.

## VERIFICATION

I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.

Executed on the __03__ day of __November__, 20__22__.

At __Georgetown__ (city), Colorado.

SIGNED:

_____
Name: NICK DIBIASE

4